**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **STEVEN D. JACO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 1:10CV130 RWS(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Steven D. Jaco for Supplemental Security Income benefits under Title

XVI of the Social Security Act. The cause was referred to the undersigned United States

Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff

has filed a Brief in Support of the Complaint. (Document Number 15). Defendant has filed a

Brief in Support of the Answer. (Doc. No. 19).

**Procedural History**

On September 7, 2007, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on October 14, 2006. (Tr. 149-51). This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated February 4, 2010. (Tr. 52-53, 10-18). On

July 17, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-3). Thus, the

decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

**A.**     **ALJ Hearing**

Plaintiff's administrative hearing was held on November 30, 2009.  (Tr. 26).  Plaintiff was present and was represented by counsel.  (<u>Id.</u>).  Vocational expert Dolores Gonzalez was also present.  (<u>Id.</u>).

The ALJ examined plaintiff, who testified that he lived alone in a mobile home, which was located across the street from his mother's home in Van Buren, Missouri.  (Tr. 28).  Plaintiff stated that he was fifty-four years of age, was five-feet ten-inches tall, and weighed 162 pounds.  (Tr. 28-29).  Plaintiff testified that he was divorced and that he had four children, who were adults.  (Tr. 29).

Plaintiff stated that his daughter-in-law drove him to the hearing.  (<u>Id.</u>).  Plaintiff testified that he does not drive.  (<u>Id.</u>).  Plaintiff stated that he lost his driver's license in 1992 due to driving while intoxicated.  (<u>Id.</u>).

Plaintiff testified that he had no source of income.  (<u>Id.</u>).  Plaintiff stated that he receives food stamps in the amount of $200.00 a month.  (Tr. 30).  Plaintiff testified that he receives Medicaid benefits.  (<u>Id.</u>).  Plaintiff stated that he last collected unemployment benefits approximately twenty years prior to the hearing.  (<u>Id.</u>).

Plaintiff testified that he left school after he completed the ninth grade.  (<u>Id.</u>).  Plaintiff stated that he quit school at that time because he thought he needed to work more than he needed to attend school.  (<u>Id.</u>).  Plaintiff testified that he never attempted to obtain his GED.  (Tr. 31).

Plaintiff stated that he has not received any vocational training or job training. (Id.). Plaintiff testified that he has a little difficulty with reading and writing. (Id.). Plaintiff stated that he is unable to write a letter. (Id.).

Plaintiff testified that he was not working at the time of the hearing. (Id.). Plaintiff stated that he last worked in June of 2004. (Id.). Plaintiff testified that he stopped working because he underwent surgery to have a pacemaker installed and his blood pressure was high. (Id.). Plaintiff stated that he tried to return to work right after his surgery and he was unable to finish a day. (Id.).

Plaintiff testified that, at his last position, he worked for John Dawson cutting logs. (Tr. 32). Plaintiff stated that this was heavy work. (Id.). Plaintiff testified that he used a chain saw at this position. (Id.). Plaintiff stated that the heaviest object he lifted at this position was the chain saw, which weighed about thirty pounds. (Id.). Plaintiff stated that he worked at this position for twenty years. (Id.).

Plaintiff testified that he also worked part-time as a sawyer for about a year. (Id.). Plaintiff stated that, as a sawyer, he put blocks on a table and sawed them into pieces. (Id.). Plaintiff testified that he lifted blocks weighing one hundred pounds at this position. (Id.).

Plaintiff stated that he has not performed any other work and has not applied for any other positions. (Id.).

Plaintiff testified that he wakes up at about 8:00 a.m. every morning. (Id.). Plaintiff stated that he makes coffee, watches television, and cooks breakfast about an hour after waking. (Tr. 34). Plaintiff stated that he then sweeps the floor, and visits his children who live nearby. (Tr. 35). Plaintiff testified that he lies down in the afternoon and usually takes a nap for an hour to an

hour-and-a-half.  (Id.).  Plaintiff stated that, after his nap, he starts cooking dinner.  (Id.).  Plaintiff testified that after dinner, he takes a shower and then goes to bed.  (Id.).

Plaintiff testified that he is able to take care of his trailer.  (Id.).  Plaintiff stated that he sweeps the floor, washes dishes, does his laundry, makes his bed, changes the sheets, and vacuums.  (Id.).  Plaintiff testified that he cooks, although he eats at his son's house two to three times a week.  (Id.).  Plaintiff stated that he shops for groceries.  (Id.).  Plaintiff testified that he gets along with everyone at the grocery store.  (Id.).  Plaintiff stated that he carries his own groceries.  (Id.).  Plaintiff testified that he has no difficulty taking a shower or bath.  (Id.).

Plaintiff stated that he never goes out to eat or to the movies.  (Id.).  Plaintiff testified that, on the weekends, he visits with his children and occasionally goes fishing.  (Id.).  Plaintiff stated that he fishes at the Current River.  (Id.).

Plaintiff testified that he has friends in his small town.  (Id.).  Plaintiff stated that friends occasionally visit him at his home.  (Id.).  Plaintiff testified that he gets along with his children and his neighbors.  (Tr. 36).  Plaintiff explained that everyone who lives near him is related.  (Id.).

Plaintiff testified that he is not active in any clubs or organizations and he does not attend church.  (Id.).  Plaintiff stated that he watches a lot of television, especially sports programs.  (Id.).  Plaintiff testified that he does not read.  (Id.).  Plaintiff stated that he does not do any yard work or gardening.  (Id.).  Plaintiff testified that his children cut his grass.  (Id.).  Plaintiff stated that he does some of his own repairs.  (Id.).  Plaintiff testified that his only hobby is fishing.  (Id.).

Plaintiff stated that he smokes a half package of cigarettes a day.  (Tr. 37).  Plaintiff testified that he does not drink alcohol.  (Id.).  Plaintiff stated that he used to have a drinking

problem but he stopped drinking. (Id.). Plaintiff testified that he does not do illegal drugs. (Id.).

Plaintiff stated that he takes prescription medication. (Id.). Plaintiff testified that he takes medication for acid reflux, which effectively controls the acid reflux. (Id.). Plaintiff stated that he takes Levothyroxine[1] for thyroid problems related to Graves disease,[2] which is effective. (Id.).

Plaintiff stated that he has had a pacemaker since 2004. (Tr. 38). Plaintiff testified that his pacemaker has not been replaced since that time. (Id.). Plaintiff stated that the pacemaker was installed because his heart was only beating thirty times a minute and he had no energy. (Id.). Plaintiff testified that his heart stopped beating occasionally when he was in the hospital. (Id.). Plaintiff stated that the pacemaker works, although he still has no energy. (Tr. 39).

Plaintiff testified that he takes Lisinopril[3] for high blood pressure, which controls his high blood pressure. (Id.). Plaintiff stated that he takes Crestor[4] for high cholesterol. (Id.).

Plaintiff testified that he takes Nitroglycerin for chest pain.[5] (Id.). Plaintiff stated that he experiences chest pain sporadically. (Id.). Plaintiff explained that he occasionally goes weeks at a time without experiencing any chest pain and he occasionally experiences chest pain a couple times a week. (Tr. 40). Plaintiff testified that he has problems with his left arm and hand and chest pain when he tries to do too much. (Id.). Plaintiff stated that he experiences shortness of

---

[1]Levothyroxine is indicated for the treatment of hypothyroidism. See Physician's Desk Reference (PDR), 2605 (63rd Ed. 2009).

[2]An autoimmune disease of the thyroid gland. Stedman's Medical Dictionary, 557 (28th Ed. 2006).

[3]Lisinopril is indicated for the treatment of hypertension. See PDR at 2088.

[4]Crestor is indicated for the treatment of hyperlipidemia. See PDR at 678.

[5]Nitroglycerin is indicated for the prevention of angina pectoris due to coronary artery disease. See PDR at 2888.

breath and must sit down when he overexerts himself.  (Id.).

Plaintiff testified that he uses an inhaler every day.  (Id.).  Plaintiff acknowledged that he should not smoke.  (Id.).

Plaintiff testified that he takes Tylenol occasionally for leg pain.  (Tr. 41).

Plaintiff stated that he experiences headaches when he takes the Nitroglycerin.  (Id.).

Plaintiff testified that his doctors have told him that heart surgery was a possibility in the future.  (Id.).  Plaintiff stated that his doctors have not recommended surgery at the time of the hearing.  (Id.).

Plaintiff testified that he has had emphysema[6] for about eight years.  (Id.).  Plaintiff stated that cold weather, humidity, fumes, and chemicals aggravate his emphysema.  (Id.).

Plaintiff testified that he has a low energy level due to the Graves disease.  (Tr. 42).

Plaintiff stated that he was diagnosed with hepatitis C[7] a few years prior to the hearing. (Id.).  Plaintiff testified that he does not know how he contracted it or how long he has had it. (Id.).  Plaintiff stated that he has not undergone interferon[8] treatment.  (Id.).  Plaintiff testified that his doctors monitor his hepatitis C every two to three months.  (Id.).

Plaintiff stated that he has bladder problems.  (Id.).  Plaintiff testified that he has difficulty urinating, which causes him to wake during the night.  (Id.).  Plaintiff stated that he also

---

[6]A condition of the lung characterized by increase in the size of air spaces distal to the terminal bronchiole, with destructive changes in their walls and reduction in their number. Clinical manifestation is breathlessness on exertion.  See Stedman's at 631.

[7]A viral disease that leads to inflammation of the liver.  About seventy-five percent of infections are subclinical and give rise to chronic persistent infection.  See Stedman's at 877.

[8]A class of small protein and glycoprotein cytokines produced in response to viral infection and other biologic and synthetic stimuli.  Interferon has been proven effective in the treatment of hepatitis C.  See Stedman's at 987.

experiences problems during the day.  (Tr. 43).

Plaintiff testified that he wears out quickly.  (Id.).  Plaintiff stated that when he starts getting tired, his left arm and left hand start hurting and he experiences chest pain.  (Id.).  Plaintiff testified that lying down for a while helps relieve these symptoms.  (Id.).

Plaintiff stated that he does not experience any depression or anxiety.  (Id.).  Plaintiff testified that his concentration is good.  (Id.).

Plaintiff stated that he has no problems sitting.  (Id.).  Plaintiff testified that when he stands for a long time he will "give out."  (Id.).  Plaintiff stated that he is able to walk on level ground "pretty good," although he has difficulty walking up hills.  (Id.).  Plaintiff testified that he is able to lift fifty pounds, although it had been a while since he had lifted this amount of weight.  (Id.).  Plaintiff stated that he becomes dizzy when he bends over and then tries to stand up too fast.  (Tr. 44).  Plaintiff testified that he is able to walk up and down steps if there are not too many.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he experiences pain in his chest, left arm, and left hand when he overexerts himself.  (Id.).  Plaintiff stated that he often tries to do too much and experiences pain a couple times a week.  (Id.).  Plaintiff testified that his arm starts aching and the palm of his hand starts hurting.  (Id.).  Plaintiff stated that the pain he experiences is moderate, about a five on a scale of one to ten.  (Tr. 44-45).  Plaintiff testified that the pain usually lasts about an hour and that it stops when he lies down for an hour.  (Tr. 45).  Plaintiff stated that his pain is worse during the summer if he is outside.  (Id.).  Plaintiff testified that his pain decreases if he takes two aspirins.  (Id.).  Plaintiff stated that he takes Nitroglycerin two to three times a month.  (Id.).

Plaintiff testified that he believes his pain would prevent him from working. (Id.). Plaintiff stated that the pain is too severe to tolerate while working. (Tr. 46).

Plaintiff testified that he believes his pain comes from his heart even though he has the pacemaker. (Id.). Plaintiff stated that his doctors have not told him that he needed surgery at the time of the hearing. (Id.).

The ALJ then examined the vocational expert, Ms. Gonzalez, who testified that plaintiff's past positions as a log cutter and a sawyer are classified as heavy and semi-skilled. (Tr. 47).

The ALJ asked Ms. Gonzalez to assume a hypothetical claimant with the following limitations: capable of performing light work; is able to lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand, and walk six out of eight hours for a total of eight hours; limited to occasional climbing, balancing, stooping, crouching, kneeling or crawling; and no concentrated exposure to dust, fumes, gasses, chemicals, extreme heat, extreme cold, or extreme humidity. (Tr. 48). Ms. Gonzalez testified that the individual would not be capable of performing plaintiff's past work. (Id.). Ms. Gonzalez stated that the individual could perform other light and unskilled jobs, such as cashier (3,479,390 positions nationally, 81,800 positions in Missouri); ticket taker (106,570 positions nationally, 2,930 positions in Missouri); and order caller (2,906,600 positions nationally, 77,940 positions in Missouri). (Tr. 48-49). Ms. Gonzalez testified that these positions were representative and not exhaustive. (Tr. 49).

Plaintiff's attorney then examined Ms. Gonzalez, who testified that a limitation of a need to lie down or recline to alleviate symptoms one or two times for an hour would preclude all employment. (Id.).

**B.     Relevant Medical Records**

The record reveals that plaintiff presented to the Reynolds County Memorial Hospital with complaints of chest pain on June 16, 2004.  (Tr. 288).  Paul Pains, D.O. diagnosed plaintiff with bradycardia,[9] chest pain, and acute exacerbation of COPD.[10]  (Id.).  Plaintiff was discharged and transferred to Des Peres Hospital in St. Louis, under the care of cardiologist Dr. Manzoor Tariq.  (Tr. 289).

Dr. Tariq diagnosed plaintiff with Mobitz (Type II) atrioventricular block[11] and inserted a permanent pacemaker on June 17, 2004.  (Tr. 218).

Plaintiff presented to cardiologist William K. LaFoe, M.D., for follow-up on August 17, 2004. (Tr. 556).  Dr. LaFoe noted that plaintiff had experienced less symptoms since his pacemaker was installed and was almost asymptomatic.  (Id.).  Dr. LaFoe noted no abnormalities upon physical exam. (Id.).  Dr. LaFoe's impression was mild coronary artery disease.[12]  (Id.).  Dr. LaFoe recommended that plaintiff continue taking baby aspirin and stop smoking.  (Id.).

Plaintiff saw Dr. LaFoe on November 16, 2004, with complaints of chest tightness.  (Tr. 559). Dr. LaFoe stated that plaintiff appeared to be functioning normally based on the EKG he underwent that day.  (Id.).  Plaintiff complained of chest tightness with effort and at night when he tries to sleep.

---

[9]Slowness of the heartbeat.  Stedman's at 249.

[10]Chronic obstructive pulmonary disease (COPD) is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied.  Stedman's at 554.

[11]A dropped cardiac cycle that occurs without alteration in the conduction of the preceding intervals.  Stedman's at 230.

[12]Narrowing of the lumen of one or more of the coronary arteries.  Stedman's at 554.

(Id.).  Dr. LaFoe's impression was blood pressure still inadequately controlled.  (Id.).  Dr. LaFoe scheduled plaintiff for stress test to evaluate symptoms of chest tightness.  (Id.).

Plaintiff underwent a stress test on November 30, 2004, which revealed evidence of mild reversible ischemia.[13]  (Tr. 555).

Plaintiff presented to the emergency room on February 8, 2006, with complaints of chest pain.  (Tr. 262).  Tirso Aldana, M.D. diagnosed plaintiff with acute coronary syndrome,[14] cardiac arrthymia[15] status post pacemaker placement, COPD, and emphysema.  (Tr. 263).  Plaintiff was admitted to acute care to receive oxygen therapy and frequent nebulizer treatments.  (Id.).  Dr. Aldana discharged plaintiff on February 9, 2006, and recommended that he follow-up with Dr. Tariq. (Id.).

Plaintiff saw Dr. LaFoe on March 2, 2006.  (Tr. 254-56).  Upon examination, plaintiff's heartbeat was regular with no murmurs, and his lungs were clear.  (Tr. 254).  Plaintiff underwent an EKG, which was unremarkable.  (Tr. 562).  Dr. LaFoe prescribed prn Nitroglycerine and advised plaintiff to stop smoking.  (Id.).

Plaintiff presented to the emergency department on July 20, 2006 with complaints of numbness and tingling in the left upper leg.  (Tr. 353).  Plaintiff was diagnosed with left leg pain.  (Tr.

---

[13]Local loss of blood supply due to mechanical obstruction of the blood vessel.  Stedman's at 1001.

[14]Chest pain and other symptoms that happen because the heart does not get enough blood.  It includes unstable angina and heart attack.  See WebMD, http://www.webmd.com/heart-disease/tc/acute-coronary-syndrome-topic-overview (last visited October 27, 2011).

[15]Loss or abnormality of rhythm of the heartbeat.  Stedman's at 137.

354).  Plaintiff was given Toradol[16] and was discharged in stable condition.  (Id.).

Plaintiff presented to the emergency room on February 1, 2007, with complaints of weakness.  (Tr. 512).  Plaintiff also reported being rather tired and dizzy.  (Id.).  Dr. Rains noted no abnormalities upon physical examination.  (Id.).  Dr. Rains' assessment was sensation of weakness.  (Id.).  Dr. Rains indicated that plaintiff's blood work looked good.  (Id.).  He instructed plaintiff to follow-up with his regular family physician the next day.  (Id.).

Plaintiff saw Kurt G. Zimmer, D.O. on February 8, 2007, with complaints of low sodium and leg cramps.  (Tr. 622).  Dr. Zimmer's assessment was COPD, hyperlipoproteinemia,[17] hyponatremia,[18] and hypothyroidism.[19]  (Tr. 623).  Dr. Zimmer continued plaintiff's medications.  (Id.).

Plaintiff presented to the emergency room at Advanced Healthcare Medical Center on February 11, 2007, with complaints of chest pains with pains going up to the left arm.  (Tr. 480).  Upon examination, George P. Samuel, M.D. found that plaintiff's heart beat was regular, with no appreciable murmur or gallop.  (Tr. 481)  Dr. Samuel's impression was acute bronchitis,[20] rule out

---

[16]Toradol is indicated for the short-term treatment of moderate to severe pain in adults.  See WebMD, http://www.webmd.com/drugs (last visited October 27, 2011).

[17]An increase in the lipoprotein concentration of the blood.  Stedman's at 922.

[18]Abnormally low concentrations of sodium ions in circulating blood.  Stedman's at 934.

[19]Diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to gain weight, and somnolence.  Stedman's at 939.

[20]Inflammation of the mucous membrane of the bronchi.  Stedman's at 270.

pneumonia, chest pain, rule out myocardial infarction ("MI"),[21] hyponatremia, hypokalemia,[22] blood in urine, and cardiac pacemaker. (Tr. 482). Plaintiff underwent a chest x-ray, which revealed COPD. (Tr. 493). On February 13, 2007, plaintiff reported that he felt much better. (Tr. 485). Plaintiff was discharged with diagnoses of acute bronchitis, chest pain rule out myocardial infarction, improved hyponatremia, improved hypokalemia, and hypertension. (Tr. 485).

Plaintiff saw Dr. Zimmer on February 14, 2007, for follow-up after being released from the hospital. (Tr. 619). Plaintiff complained of dyspnea and cough. (Id.). Dr. Zimmer's assessment was COPD, prostatic hyperplasia,[23] hyperlipoproteinemia, hyponatremia, and hypothyroidism. (Tr. 620).

Milton Eichmann, M.D. diagnosed plaintiff with neurogenic bladder[24] on February 28, 2007. (Tr. 436). On March 28, 2007, Dr. Eichmann diagnosed plaintiff with poor urinary streams. (Tr. 437).

Plaintiff presented to the emergency room at Advanced Healthcare Medical Center on May 1, 2007, with complaints of chest pain. (Tr. 463). Dr. Aldana diagnosed plaintiff with acute coronary syndrome, rule out MI, and COPD, and admitted plaintiff. (Tr. 464). Plaintiff underwent a chest x-ray, which revealed no evidence of acute cardiopulmonary process. (Tr. 471). On May 2, 2007, plaintiff denied chest pain and reported feeling much better. (Tr. 466). He was discharged to home. (Id.).

---

[21]Heart attack. Stedman's at 968.

[22]The presence of an abnormally low concentration of potassium ions in the circulating blood. Stedman's at 934.

[23]Enlarged prostate. See Stedman's at 925.

[24]Any defective functioning of bladder due to impaired innervation. Stedman's at 226.

Plaintiff presented to the emergency room at Advanced Healthcare Medical Center on May 21, 2007, with complaints of chest pain and shortness of breath. (Tr. 446-47). Upon physical examination, J. Michael Hoja, M.D. found that plaintiff was in no acute distress. (Tr. 446). Plaintiff's heart had a regular rate and rhythm without murmurs. (Tr. 447). Dr. Hoja diagnosed plaintiff with chest pain, emphysema, and cardiac arrhythmia, and admitted plaintiff. (Id.). Plaintiff underwent a chest x-ray on May 21, 2007, which was normal. (Tr. 461). On May 22, 2007, Dr. Rains noted that plaintiff denied chest pain and felt considerably better. (Tr. 449). Dr. Rains' assessment was chest pain, resolved. (Id.). Plaintiff was discharged. (Id.).

Plaintiff saw Dr. Zimmer on May 24, 2007, at which time plaintiff reported that he was not feeling tired or poorly. (Tr. 614). Dr. Zimmer noted no abnormalities on physical examination. (Tr. 615). Dr. Zimmer's assessment was COPD, hepatitis, prostatic hyperplasia, hyperlipoproteinemia, and hypothyroidism. (Id.). He continued plaintiff's medications. (Id.).

On June 6, 2007, plaintiff presented to Katherine A. Swenson, FNP, a nurse practitioner in Dr. Zimmer's office, with complaints of dizziness, weakness, and difficulty breathing. (Tr. 611). Upon examination, Ms. Swenson found that plaintiff was not healthy appearing, his breathing was shallow, he was in acute distress, and he was unable to "get his breath." (Id.). Ms. Swenson ordered spirometry and a chest x-ray, and advised plaintiff to present to the ER if problems recur. (Tr. 612).

Plaintiff presented to Poplar Bluff Regional Medical Center on June 7, 2007, with complaints of chest pain and tightness. (Tr. 582). Plaintiff underwent cardiac catheterization, which revealed noncritical coronary artery disease. (Id.). Plaintiff was admitted for observation. (Id.). Plaintiff was discharged on June 8, 2007, with diagnoses of chest pain of noncardiac origin, history of GERD,

hypertension, hypercholesterolemia, and hypothyroidism. (Id.). Plaintiff was prescribed Synthroid,[25] Prinivil,[26] Lopressor,[27] Protonix,[28] Pravachol,[29] and Plavix.[30] (Id.).

Plaintiff presented to the emergency room at Advanced Healthcare Medical Center on June 9, 2007, with complaints of dizziness. (Tr. 505). Plaintiff reported that he was discharged from Poplar Bluff Regional Medical Center the previous day after he had a blood clot. (Id.). Upon physical examination, Dr. Rains noted no abnormalities other than plaintiff was somewhat weak. (Id.). Plaintiff underwent a chest x-ray, which revealed hyperinflated lungs. (Tr. 508). Dr. Rains' assessment was weakness and dizziness. (Id.). Dr. Rains informed plaintiff that, after prolonged hospitalization, a person will be weak and may be dizzy for a period of time. (Id.). Plaintiff was discharged to home. (Id.).

Plaintiff presented to Poplar Bluff Regional Medical Center on June 11, 2007, with complaints of chest pain with pericarditis.[31] (Tr. 570). Plaintiff underwent echocardiography, which revealed an ejection fraction[32] of sixty percent, trace tricuspid insufficiency, and no evidence of pericardial or

_____

[25]Synthroid is indicated for the treatment of hypothyroidism. See PDR at 507.

[26]Prinivil is indicated for the treatment of hypertension. See PDR at 2088.

[27]Lopressor is indicated for the treatment of hypertension. See WebMD, http://www.webmd.com/drugs (last visited October 27, 2011).

[28]Protonix is indicated for the treatment of GERD. See PDR at 3255.

[29]Pravachol is indicated for the treatment of high cholesterol. See WebMD, http://www.webmd.com/drugs (last visited October 27, 2011).

[30]Plavix is indicated for the treatment of acute coronary syndrome. See PDR at 928.

[31]Inflammation of the pericardium. Stedman's at 1457.

[32]The fraction of the blood contained in the ventricle at the end of diastole that is expelled during its contraction. A normal ejection fraction is more than fifty-five percent of the blood

pleural effusion on exam.  (Tr. 578).  Plaintiff was discharged in stable condition on June 12, 2007.  (Id.).

Plaintiff presented to Saint Francis Medical Center on June 15, 2007, upon transfer from Poplar Bluff by air, with complaints of chest pain.  (Tr. 541).  Dr. LaFoe indicated that plaintiff had undergone a cardiac catheterization and was told that he had no blockages.  (Id.).  Upon examination, plaintiff was in no acute distress and his heart had a regular rate and rhythm with no murmur.  (Id.).  Dr. LaFoe's impression was somewhat atypical chest pain, most likely chest wall.  (Tr. 542).  Dr. LaFoe stated that he doubted pericarditis and unstable angina[33] due to a normal catheterization a few days prior.  (Id.).  Plaintiff underwent an echocardiogram and chest x-rays, both of which were normal.  (Tr. 539, 548).  Plaintiff was discharged on June 17, 2007.  (Tr. 539).

Plaintiff saw Dr. Zimmer on June 18, 2007, to obtain lab results.  (Tr. 608).  Plaintiff tested positive for hepatitis C.  (Tr. 609).  Dr. Zimmer's assessment was COPD, chronic hepatitis C virus, prostatic hyperplasia, hyperlipoproteinemia, and hypothyroidism.  (Id.).  Dr. Zimmer referred plaintiff to Dr. Ted Greishop for his hepatitis C.  (Id.).

Plaintiff saw Ms. Swenson on July 24, 2007, at which time he indicated that he had been to the ER for his "nerves" and was given Prozac.[34]  (Tr. 606).  Plaintiff was very upset and on the verge of tears due to losing his granddaughter whom he had raised as her parents were moving to Maryland.  (Id.).  Plaintiff reported feeling tired, decreased concentration, and anxiety with persistent worry.

---

volume.  See Stedman's at 769.

[33]Chest pain.  See Stedman's at 85.

[34]Prozac is indicated for the treatment of major depressive disorder.  See PDR at 1852-53.

- 15 -

(Id.).  Ms. Swenson assessed seasonal pattern depression[35] and anxiety disorder NOS.[36]  (Id.).  She prescribed Atarax[37] and Prozac.  (Id.).

Plaintiff saw Milton Levin, D.O. on August 29, 2007, for a follow-up regarding his depression and nervousness related to his granddaughter leaving.  (Tr. 598).  Plaintiff reported that he has been able to get over the situation and was doing much better.  (Id.).  Plaintiff was still taking his Prozac and Atarax daily.  (Id.).  Dr. Levin continued plaintiff's medications.  (Id.).

Plaintiff saw Dr. Zimmer on September 28, 2007, for follow-up and medication refills.  (Tr. 603).  Dr. Zimmer's assessment was asymptomatic coronary arteriosclerosis,[38] COPD, chronic hepatitis C virus, hypothyroidism, seasonal pattern depression-in remission, and anxiety disorder NOS.  (Id.).

Plaintiff saw Dr. Zimmer on October 10, 2007, with complaints of a cough with wheezing.  (Tr. 602).  Dr. Zimmer diagnosed plaintiff with acute bronchitis.  (Tr. 603).  On October 18, 2007, plaintiff reported feeling better and his bronchitis had resolved.  (Tr. 600-01).

Marsha Toll, PsyD. completed a Psychiatric Review Technique on November 20, 2007, in

---

[35]Seasonal pattern depression, or seasonal affective disorder, is a depressive mood disorder that occurs at approximately the same time year after year and spontaneously remits at the same time each year.  Stedman's at 570.

[36]A disorder with prominent anxiety or phobic avoidance that does not meet criteria for any specific anxiety disorder.  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 444 (4th Ed. 1994).

[37]Atarax is indicated for the short-term treatment of nervousness and tension that may occur with certain mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited October 27, 2011).

[38]Degenerative and metabolic changes of the walls of the coronary arteries.  See Stedman's at 144.

which she expressed the opinion that plaintiff's seasonal pattern depression-in remission and anxiety disorder NOS were not severe and resulted in mild functional limitations. (Tr. 628-38).

Plaintiff presented to the Poplar Bluff Regional Medical Center on August 2, 2008, with complaints of chest pain. (Tr. 750). Upon examination, plaintiff was in no acute distress, and his heart had regular rate and rhythm, with no murmur or gallops. (Tr. 751). Plaintiff was diagnosed with nonspecific chest pain. (Id.). It was noted that the initial assessment was negative for an acute coronary event. (Id.). On August 2, 2008, plaintiff reported that he was feeling better and had no chest pain. (Tr. 756). Plaintiff underwent a chest x-ray on August 4, 2008, which revealed an ejection fraction of forty-five percent. (Tr. 737). Plaintiff was discharged on August 4, 2008, at which time he was asymptomatic. (Tr. 758). It was strongly advised that plaintiff stop smoking. (Id.).

Plaintiff saw Dr. Zimmer on March 2, 2009, for a check-up, at which time he reported that he felt good. (Tr. 656). Plaintiff was not feeling tired and had no chest pain or discomfort. (Id.). Dr. Zimmer continued plaintiff's medications. (Id.).

Plaintiff saw Dr. Zimmer on April 30, 2009, with complaints of soreness in his neck for a week. (Tr. 653). Dr. Zimmer found no abnormalities upon physical examination. (Tr. 654). Dr. Zimmer's assessment was cervicalgia.[39] (Id.).

Plaintiff presented to Southeast Missouri Hospital on September 10, 2009, with complaints of anterior chest discomfort going up into his left shoulder and left arm with some nausea and diaphoresis. (Id.). Upon examination, plaintiff's heart had a regular rate and rhythm, with no murmur, gallop or rub. (Tr. 677). Plaintiff was diagnosed with unstable angina. (Id.). Plaintiff

---

[39]Neck pain. See Stedman's at 351.

underwent left heart catheterization with left ventricular function study and coronary angiography, which revealed an ejection fraction of sixty percent, diffuse mild to moderate coronary artery disease but nothing that appears to be critical, and normal left ventricular systolic function. (Tr. 680).

Plaintiff saw Dr. Zimmer on September 14, 2009, with complaints of dyspnea. (Tr. 648). Plaintiff requested a breathing test. (Id.). It was noted that plaintiff was applying for disability benefits. (Id.). Dr. Zimmer's assessment was shortness of breath, COPD, chronic hepatitis, and hypothyroidism. (Tr. 649).

Plaintiff saw Dr. Zimmer on September 28, 2009, at which time he requested that Dr. Zimmer complete papers to support his claim for disability benefits. (Tr. 646). Dr. Zimmer indicated that plaintiff had recently been hospitalized in Cape Girardeau for unstable angina. (Id.). Dr. Zimmer stated that plaintiff had exertional dyspnea, exertional angina, and pain in his left arm and hand. (Id.). Dr. Zimmer also noted that plaintiff's vision was reduced due to cataracts. (Id.). Dr. Zimmer's assessment was exertional angina, COPD, hypercholesterolemia, and hypothyroidism. (Tr. 647). Dr. Zimmer continued plaintiff's medications. (Id.).

Dr. Zimmer completed a Medical Source Statement-Physical on September 28, 2009. (Tr. 640-41). Dr. Zimmer expressed the opinion that plaintiff could lift and carry ten pounds frequently, and twenty-five pounds occasionally; stand or walk continuously for thirty minutes and stand or walk three hours throughout an eight-hour workday; sit continuously for two hours; and sit four hours throughout an eight-hour workday. (Tr. 640). Dr. Zimmer found that plaintiff could never climb, balance, stoop, kneel, crouch, or crawl; and could occasionally reach, handle, and finger. (Tr. 641). Dr. Zimmer indicated that plaintiff should avoid any exposure to extreme cold, extreme heat, weather, dust/fumes, hazards, and heights; and should avoid moderate exposure to wetness/humidity and

vibration.  (Id.).  Dr. Zimmer found that plaintiff needed to lie down or recline one to two times during an eight-hour work day for an hour due to chest pain.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since September 7, 2007, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: coronary artery disease, chronic obstructive pulmonary disease, hypertension, hypothyroidism, hepatitis C, and history of neurogenic bladder (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments (20 CFR Part 404, Subpart P, Appendix 1, Part A) (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; climbing, balancing, stooping, crouching, kneeling, or crawling more than occasionally; and concentrated exposure to dust, fumes, gases, chemicals, and extreme heart, cold, or humidity.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant is 54 years old, born on October 6, 1955, which is defined as an individual closely approaching advanced age (20 CFR 416.963).

7.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that

the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since September 7, 2007, the date the application was filed (20 CFR 416.920(g)).

(Tr. 11-18).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on September 7, 2007, the claimant is not disabled (Social Security Act, section 1614(a)(3)(A)).

(Tr. 18).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a

"searching inquiry."  Id.

## B.     The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one

of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See id.</u> Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. <u>See</u> 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. <u>See id.</u> Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.     Plaintiff's Claims

Plaintiff first argues that the ALJ erred in finding that plaintiff's combination of impairments did not meet or equal a listing. Plaintiff next argues that the ALJ erred in determining plaintiff's

residual functional capacity. The undersigned will discuss plaintiff's claims in turn.

1.      **Listings**

Plaintiff argues that the ALJ erred in finding that plaintiff did not suffer from an impairment or combination of impairments that meets or medically equals one of the listed impairments.

The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). To meet a listing, an impairment must meet all of the listing's specified criteria. Id. An impairment that manifests only some of these criteria, no matter how severely, does not qualify. Id. (quoting Sullivan v. Zebley, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)). Although it is preferable that ALJs address a specific listing, failure to do so is not reversible error if the record supports the overall conclusion. Pepper ex rel Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).

In this case, plaintiff fails to explain how his impairments meet a listing. He does not identify the listing or listings he claims to meet or equal. Plaintiff cites no medical evidence that would support such a finding. Plaintiff merely argues that he has more than one impairment and that the "signs and findings for the impairment are to be considered in combination to determine if Plaintiff meets a listed impairment." (Doc. No. 15, p. 6). Plaintiff has failed to meet his burden to establish that his impairments meet or equal a listing.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

2.      **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity ("RFC"). Specifically, plaintiff contends that the ALJ did not cite any medical evidence in support

of his determination.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

> The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; climbing, balancing, stooping, crouching, kneeling, or crawling more than occasionally; and concentrated exposure to dust, fumes, gases, chemicals, and extreme heart, cold, or humidity.

(Tr. 14).

Plaintiff contends that residual functional capacity ("RFC") is a medical determination which requires some medical evidence. While the formulation of RFC is a medical question, Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000), it is based on all the relevant, credible evidence of record including the medical records, observations of treating physicians and others, and an individual's own

description of limitations.  See McKinney, 228 F.3d at 863.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).

In support of his RFC determination, the ALJ first discussed plaintiff's credibility and found that plaintiff's subjective complaints were not entirely credible, a finding that plaintiff does not challenge.  In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ need not explicitly discuss each factor, however.  Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).  It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Id.

Here, the ALJ properly considered inconsistencies between plaintiff's subjective allegations and the evidence of record.  The ALJ first discussed plaintiff's daily activities.  (Tr. 14).  The ALJ noted that plaintiff testified that he watched television, performed light household chores, cooked, fished, and visited with others.  (Id.).  The ALJ found that plaintiff's daily activities were inconsistent with his allegations of disabling symptoms.  (Tr. 15).  The ALJ noted that plaintiff is able to live and function independently, provide his own care, cook, perform light household chores, go grocery shopping, fish, and drive an automobile.  (Id.).  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  As such, the ALJ properly determined that plaintiff's daily activities appear inconsistent with the inability to work.

The ALJ also found that plaintiff's work history detracted from his credibility. (Tr. 15). Specifically, the ALJ noted that plaintiff has never worked on more than a sporadic basis, and has never demonstrated a consistent motivation to work. (Id.). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

The ALJ next pointed out that plaintiff received minimal or conservative medical treatment since September 7, 2007. (Tr. 15). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ also noted that there is no evidence that plaintiff's prescribed medication is not generally effective or that it imposes significant side effects. (Tr. 15). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

The ALJ next discussed the medical evidence, and found that the medical evidence does not support plaintiff's allegations of disability. (Tr. 15-16). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). With regard to plaintiff's heart impairment, the ALJ stated that diagnostic cardiac testing during the relevant period indicates sub-critical coronary artery disease without ischemia and essentially normal left ventricular ejection fraction, and no evidence of pacemaker dysfunction. (Tr. 15). The ALJ stated that plaintiff's cardiac condition appears stable with prescribed medication therapy. (Id.).

With respect to plaintiff's COPD, the ALJ stated that the symptoms of exertional dyspnea are

treated and controlled with prescribed respiratory medication. (<u>Id.</u>). The ALJ further found that plaintiff's hypertension and hypothyroidism are effectively controlled with medication. (<u>Id.</u>). These findings are supported by the record.

The ALJ next discussed the medical opinion evidence. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting <u>Bentley v. Shalala</u>, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." <u>Rhodes v. Apfel</u>, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting <u>Metz v. Halala</u>, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." <u>Id.</u> at 1013 (quoting <u>Bentley</u>, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" <u>Id.</u> (quoting <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997)).

The ALJ first noted that a state agency counselor, D. Horn, determined that plaintiff was limited to light exertional work activity with non-exertional postural and environmental limitations. (Tr. 16). The ALJ properly noted that the opinions of a non-examining lay person are not entitled to deference as a medical source opinion. <u>See Dewey v. Astrue</u>, 509 F.3d 447, 448 (8th Cir. 2007). The ALJ, however, noted that these opinions are considered and weighed as those of a lay person

knowledgeable in the evaluation of the medical issues in disability claims under the Social Security Act. (Tr. 16). The ALJ indicated that he "generally accepts" the opinion of Dr. Horn because it was supported and consistent with the objective medical evidence and generally corroborated by the opinion of treating physician Dr. Zimmer.

Dr. Zimmer was plaintiff's treating physician since approximately February 2007. (Tr. 622). Dr. Zimmer completed a Medical Source Statement-Physical on September 28, 2009. (Tr. 640-41). Dr. Zimmer expressed the opinion that plaintiff could lift and carry ten pounds frequently, and twenty-five pounds occasionally; stand or walk continuously for thirty minutes and stand or walk three hours throughout an eight-hour workday; sit continuously for two hours; and sit four hours throughout an eight-hour workday. (Tr. 640). Dr. Zimmer found that plaintiff could never climb, balance, stoop, kneel, crouch, or crawl; and could occasionally reach, handle, and finger. (Tr. 641). Dr. Zimmer indicated that plaintiff should avoid any exposure to extreme cold, extreme heat, weather, dust/fumes, hazards, and heights; and should avoid moderate exposure to wetness/humidity and vibration. (Id.). Dr. Zimmer found that plaintiff needed to lie down or recline one to two times during an eight-hour work day for an hour due to chest pain. (Id.).

The ALJ stated that he was assigning no weight to Dr. Zimmer's opinion that plaintiff had no capacity to perform postural activities and to Dr. Zimmer's opinion that plaintiff was able to stand or walk a maximum of no more than three hours in an eight-hour workday. (Tr. 16). The ALJ found that this part of Dr. Zimmer's opinion deficient because Dr. Zimmer does not articulate an objective medical basis for these limitations, which are inconsistent with Dr. Zimmer's own medical treatment records and the conservative treatment rendered. (Id.). The ALJ further found that these limitations are inconsistent with the record as a whole, including plaintiff's testimony regarding his daily

activities.

The undersigned finds that the ALJ properly analyzed the opinion of Dr. Zimmer. The ALJ found that plaintiff was capable of performing light work. (Tr. 14). Dr. Zimmer's opinion that plaintiff was capable of lifting and carrying ten pounds frequently, and twenty-five pounds occasionally is consistent with the performance of light work.

The ALJ provided sufficient reasons for discounting Dr. Zimmer's opinion that plaintiff had no capacity to perform postural activities, was able to stand or walk a total of three hours in an eight-hour workday, was able to sit a total of four hours, and that plaintiff needed to recline once or twice a day for an hour to relive his complaints of chest pain. (Tr. 16). The ALJ first noted that this portion of Dr. Zimmer's opinion was not supported by the medical record, including Dr. Zimmer's own treatment notes. (Id.). Dr. Zimmer's treatment notes indicate that physical examinations typically revealed no abnormalities. (Tr. 615, 654). On May 24, 2007 and March 2, 2009, plaintiff had no complaints and reported feeling well. (Tr. 614, 656). Dr. Zimmer's treatment notes do not document consistent complaints of chest pain. The medical record reveals that plaintiff received conservative treatment for his impairments. Although plaintiff presented to the emergency room on several occasions with complaints of chest pain, testing and examinations typically revealed no abnormalities and plaintiff's symptoms resolved upon discharge.

The ALJ further found that the limitations found by Dr. Zimmer are inconsistent with the record as a whole, including plaintiff's testimony regarding his daily activities. Plaintiff testified that he has no problems sitting. (Tr. 43). Plaintiff testified that his legs give out only when he stands for long periods. (Id.). Plaintiff stated that he was able to walk pretty well on level ground but he had difficulty walking up hills. (Id.). Although plaintiff testified that he usually takes a nap in the

afternoon for an hour to an hour-and-a-half, plaintiff did not indicate that he needed to lie down to relieve pain. (Tr. 35). Rather, plaintiff testified that he experiences pain in his chest, left arm, and left hand only when he overexerts himself. (Tr. 44). Further, as previously discussed, plaintiff testified that he engaged in significant daily activities, including light housework, shopping, and fishing. The ALJ properly found that the limitations found by Dr. Zimmer were inconsistent with plaintiff's testimony.

The residual functional capacity assessed by the ALJ is supported by substantial evidence. The ALJ's determination is supported in part by the opinion of treating physician Dr. Zimmer. The remainder of the limitations found by the ALJ are consistent with the record as a whole, including plaintiff's own testimony.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for Supplemental Security Income benefits under Title XVI of the Social Security Act be **affirmed**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this   7th   day of November, 2011.


*Lewis M. Blanton*
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE